Filed 10/27/21  P. v. Perez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076051 |
| v. | (Super.Ct.No. SCR41000) |
| RICHARD DAVID PEREZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Gregory S. Tavill, Judge. Affirmed.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Kathryn Kirschbaum, and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

1

In 1983, a jury convicted Richard David Perez of multiple violent crimes, including murder, for his participation in a spree of home invasions featuring a rotating cast of codefendants. In 2019, he filed a petition for resentencing under the then newly enacted Penal Code section 1170.95, unlabeled statutory references refer to this code. The court filed an order to show cause and held an evidentiary hearing, after which it denied the petition.

On appeal, Perez argues there was insufficient evidence to support the conclusion he was a major participant in the underlying felony who acted with reckless indifference to human life. We affirm.

## I. FACTS

Over a four-month period, Phillip Walz led a group of four other men, including Perez, on a crime spree targeting 12 different homes and businesses for robbery and other crimes. Walz and his group terrorized whomever they found at each place and, among other things, perpetrated sex offenses upon two victims and shot three others, fatally wounding one. The jury found Perez was with Walz when the last victim was murdered, and he was present during two earlier incidents.[1]

A.    *The April 22, 1983 Incident*

On April 22, 1983, Perez and another man entered Christiaan I.'s home while he, his wife, two sons, two of his brothers, and his sister-in-law were having dinner. Perez

---

[1] The facts are taken from this court's prior nonpublished opinion in defendant's prior appeal, case No. E01582, which is part of the record on appeal in this case. (*People v. Perez* (Sept. 5, 1986, E001582) [nonpub. opn.].)

was armed with a shotgun. The other man was armed with a handgun, was more violent, and did most of the talking. One of the witnesses later identified him as Walz.

Walz threatened to kill members of the family and struck Christiaan's brother Eugene twice in the face with a handgun, breaking his nose. Walz then separated Christiaan from the rest of his family, handcuffed him, and put a gun to his head. Perez and Walz stole personal belongings, including jewelry, from the family members. When Christiaan's wife had trouble getting her wedding ring off, Walz threatened to cut off her finger. Walz became more violent throughout the robbery. While Walz did most of the talking, Perez covered the family with his shotgun.

Christiaan told Walz they were expecting company, and that he and Perez could leave because they had all the family's valuables. Walz said if more people were coming that was even better. He and Perez waited for the other guests to arrive. The guests, Ronnie and his son Baudy, eventually came to the front door, but Ronnie became suspicious and told his son to run. As Baudy attempted to run, one of the two men hit him over the head, causing him to collapse. Christiaan didn't see who hit Baudy, but he and another witness both heard Perez say, "I think he's dead," and tell Walz they should leave.

B.    *The April 24, 1983 Incident*

On April 24, 1983, Perez and another man entered the home of Kenneth and Gretchen G. while they were watching television. Kenneth later identified the other man as Quillen. According to Kenneth, Quillen was loud and aggressive and did most of the

talking. Quillen held a gun to Kenneth's head and a knife to his throat and threatened to kill him. The men told Kenneth to lie down on the floor face-first, and when he did so they hog-tied him using objects from the home. Both men threatened Kenneth with death multiple times and would kick him if he responded to a question in a way they didn't like. They stole jewelry and cash. At one point, Quillen put his gun to Kenneth's head and said he would shoot if Kenneth didn't say where his Versatel card was by the count of five. Quillen began counting, and Kenneth heard the gun's chamber rotating, but Quillen ultimately didn't fire. At another point, Quillen threw his gun down next to Kenneth and said he would kill him before he could reach the gun because Quillen was young and strong and Kenneth was an old man.

Quillen took Gretchen to the bedroom, and after finding a couple additional small items of value punched her in the face for holding out. Later, he took her to another bedroom, pointed his gun at her, told her to take off her pants, and ordered her to perform oral sex on him or else she would have to have sex with him. He said if she didn't do as he said they would kill her and her husband. He then raped Gretchen. After Quillen tied her hands behind her back, Perez also raped her at gunpoint. Both men threatened to shoot her if she didn't stop crying while Perez raped her.

C.    *The April 29, 1983 Incident*

On April 29, 1983, Michael and Georgia H. returned home with their 10-month-old grandson around 10:30 at night. After bringing their grandson inside, Georgia told Michael to go back out to the garage to get the diaper bag. After Michael left, Georgia

4

heard a lot of noise in the garage and then a scream. Immediately after hearing the noises Perez entered the house, approached Georgia, put a gun to her head and ordered her into the bedroom. Georgia then heard two gunshots in the garage. Perez ran into the garage, and Georgia barricaded herself and her grandson in a bedroom.

Michael died from the gunshot wounds. He suffered two gunshot wounds, one to the head and one to the chest. Both wounds would have been fatal, though the gunshot wound to the head would've killed him much more quickly.

Later that evening, Perez and Walz went to Jeffrey O.'s apartment. Perez told him he saw Walz and Michael struggling, but assumed Walz could handle it and ran into the house instead. Walz told Jeffrey O. that Michael pulled his mask off during the struggle. Michael said he'd seen Walz's face, so Walz shot him twice. Walz believed he missed the first shot but knew the second one hit Michael's head.

D.      *Arrest*, *Statements to Police*, *and Testimony*

Police questioned Perez in early May 1983. They recorded the interview, and the People played this recording for the jury.

After initially denying any involvement, Perez eventually admitted that he, Walz, and another man were involved. He said Walz and another man picked him up, and they drove by Michael's house and saw he and his wife were home. They pulled back around to the house, and when they got nearby Walz handed Perez a gun and a mask. He and Walz left the car, with Walz going to the garage and Perez going to the house. Before he entered the house, Perez saw Walz and Michael struggling over the gun. He also said he

5

left the house to go to the garage after he heard a single gunshot. He asked Walz, "What the fuck are you doing?" and " 'What did you do?' " He also told the police he "shot one off at, Damn, you stupid motherfuckers." He said he saw Walz point the gun at Michael and yelled " 'No' " before Walz fired a second shot. He took off running before he even saw Michael fall.

E.    *Procedural History*

"[On September 5, 1984], [a] jury convicted [] Perez of first degree murder . . . , conspiracy to rob and burgle . . . , eight counts of robbery of an inhabited dwelling . . . , three counts of residential burglary . . . , and one count each of attempted robbery of an inhabited dwelling . . . , rape in concert . . . and receiving stolen property. The jury further found gun use allegations . . . as to all crimes except the conspiracy and receiving stolen property."

The judge sentenced Perez to a determinate term of 32 years eight months and a consecutive indeterminate term of 25 years to life. Perez appealed, and on appeal this court reversed one of his burglary convictions and stayed concurrent sentences for two others.

On February 19, 2019, Perez filed a petition for resentencing under section 1170.95. The trial judge determined the petition made a prima facie case and ordered an evidentiary hearing on the merits. The judge held the hearing on October 2, 2020, and denied the petition. In doing so it found "beyond a reasonable doubt that []

6

Perez was a major participant in this crime . . . who acted with reckless indifference to human life."

Perez appealed.

## II.  ANALYSIS

Perez argues he is entitled to relief under section 1170.95 because he was not the actual killer and there was insufficient evidence he was a major participant in the underlying felony and that he acted with reckless indifference to human life.

Senate Bill No. 1437, which became effective on January 1, 2019, "addresses certain aspects of California law regarding felony murder and the natural and probable consequences doctrine by amending Penal Code sections 188 and 189." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 722.) Under section 189 as amended, "a participant in enumerated crimes is liable under the felony-murder doctrine only if he or she was the actual killer; or, with the intent to kill, aided and abetted the actual killer in commission of first degree murder; or was a major participant in the underlying felony and acted with reckless indifference to human life." (*People v. Munoz* (2019) 39 Cal.App.5th 738, 749, review granted Nov. 26, 2019, S258234.)

In order to seek resentencing under section 1170.95, a petitioner must first file a petition meeting certain standards and alleging they are eligible for relief. (§ 1170.95, subds. (a), (c).) If the petitioner would be entitled to relief were his factual allegations true, the judge must then issue an order to show cause. (*People v. Lewis* (2021) 11 Cal.5th 952, 971.) Once the judge has issued an order to show cause, they must hold "a

7

hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner." (§ 1170.95, subd. (d)(1).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).)

The People point out that there is a split in authority regarding how the reasonable doubt standard should be applied—that is, whether the People must prove that a jury *could* find a petitioner guilty under the new law or whether they must prove actual guilt. (See, e.g., *People v. Duke* (2020) 55 Cal.App.5th 113, review granted Jan. 13, 2021, S265309; cf. *People v. Clements* (2021) 60 Cal.App.5th 597, review granted Apr. 28, 2021, S267624.) However, this court has previously held that "the People ha[ve] the burden to prove the record of conviction and any new or additional evidence the parties submit establish beyond a reasonable doubt that [the petitioner] committed murder under the amended law." (*People v. Clements*, at p. 614.) Though that decision is currently under review, we see no reason to depart from our reasoning in that case.

When reviewing a sufficiency of the evidence claim, we must determine " ' "whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738-739; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) Substantial evidence is "evidence which is reasonable, credible, and of solid value." (*People v. Johnson*, at p. 578.) We view the evidence in a light most favorable to the judgment and "resolve all evidentiary conflicts

8

and questions of credibility 'in favor of the verdict.' " (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014, quoting *People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.) We may not reverse the judgment "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331, quoting *People v. Redmond* (1969) 71 Cal.2d 745, 755.)

A.    The *Tison-Enmund* Spectrum

The language amended section 189 uses to identify who is still liable for felony murder now—someone who was "a major participant in the underlying felony and acted with reckless indifference to human life"—comes out of two United States Supreme Court cases that considered when the death penalty could be used against people convicted of murder who were not the actual killers. These two cases are *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*). Both involved defendants who were not the actual killers but who participated in an underlying felony during which one of their codefendants killed. In both cases the defendants were sentenced to death, and the court was asked to determine whether the death penalty could apply to those only vicariously liable for a killing.

Our Supreme Court adopted this standard to assess culpability in two cases, *People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). Thus, assessing whether a defendant was a major participant who acted with reckless indifference to human life requires us to consider both the United

9

States Supreme Court's explanation of this standard and our own Supreme Court's clarification.

In *Enmund* the defendant "drove two armed confederates to [Thomas] Kersey's house and waited nearby while they entered. When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys. Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons." (*Banks*, *supra*, 61 Cal.4th at p. 799.) The United States Supreme Court reversed Enmund's death sentence and "held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor 'who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' " (*Ibid.*)

In contrast, in *Tison*, "Prisoner Gary Tison's sons Ricky, Raymond, and Donald Tison conducted an armed breakout of Gary and his cellmate from prison, holding guards and visitors at gunpoint. During the subsequent escape, their car, already down to its spare tire, suffered another flat, so the five men agreed to flag down a passing motorist in order to steal a replacement car. Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' original car with the others following. . . . Gary and his cellmate then killed all four family members." (*Banks*, *supra*, 61 Cal.4th at p. 799.) In that case the United States Supreme Court laid out a spectrum of culpability, with minor actors like Enmund on one side and actual, intentional, or attempted killers on the other. (*Tison*, *supra*, 481 U.S. at pp. 149-150.) Between those two extremes, "major

10

participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement" in order to apply the death penalty. (*Id.* at p. 158.) The court concluded that the Tisons met this standard, and therefore the constitution did not prohibit sentencing them to death.

Thus, *Tison* and *Enmund* establish two points along a spectrum of culpability. On one end is Enmund, the quintessential getaway driver, who could not be put to death over his involvement in the felony which resulted in two deaths. Somewhere further along are the Tisons, who the court concluded could be put to death because they were major participants in the underlying felony who acted with reckless indifference to human life.

In *Banks* and *Clark*, our Supreme Court considered this spectrum in the context of California's death penalty. In doing so, it clarified what constituted "major participation" and "reckless indifference to human life" under California law for these purposes. Thus, though *Banks* and *Clark* predate the enactment of Senate Bill No. 1437 and section 1170.95, they are the leading cases in defining the elements necessary to find that a given defendant is still liable for murder under the now much restricted qualifications.

B.      *Major Participation*

In *Banks*, *supra*, 61 Cal.4th at p. 794, our Supreme Court considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." The court counseled that " 'major participation' should be understood as the phrase is used in common parlance, as including those whose involvement is ' "notable

11

or conspicuous in effect or scope" ' and who are ' "one of the larger or more important members . . . of a . . . group." ' " (*Id.* at p. 800.)

Our Supreme Court concluded that "*Tison* and *Enmund* establish that a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund." (*Banks, supra*, 61 Cal.4th at p. 802.) The court set out a number of factors relevant to assessing whether a given defendant met these criterion, namely: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Id.* at p. 803.)

Given this standard, and viewing the evidence in the light most favorable to the judgment, we are inclined to agree with the trial judge that "there can't be any significant argument that [Perez] wasn't a major participant." Perez participated in multiple home invasion burglaries prior to the killing, including at least one with the actual killer Walz.

12

In all of these the men were armed, they attacked the victims, and they used the threat of death to subdue their victims. Perez and an accomplice also raped one of their prior victims, both threatening to kill her if she didn't comply. Most importantly, Perez was involved in a prior incident in which he believed they might have killed one of their victims, and still went out with Walz after that. Given this, Perez unquestionably had "awareness . . . of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants." (*Banks*, *supra*, 61 Cal.4th at p. 803.)

With regard to planning, the evidence suggests that the planning for these crimes was minimal, as the men simply drove around until one or more identified a home they wanted to attack. However, this lack of planning increases Perez's culpability, since his participation in what little planning there was is necessarily amplified. Thus, though Perez was the subordinate in all of these crimes, he nevertheless seems to have actively participated in what planning actually occurred by going out with the others with the intention of burglarizing some home.

Finally, Perez's actions after the fact also weigh against him. After Walz killed Michael, Perez made no effort to render aid or come clean. Indeed, Perez left before Michael hit the ground, before he could even confirm Michael's state.

Nevertheless, Perez points to the *Banks* factors that do not fit his conduct to argue he was not a major participant. In particular, Perez argues the evidence shows he didn't supply the weapons and didn't cause nor was he in a position to stop the killing. Perez also argues that his awareness of the dangers of the crimes was minimal, since his

13

previous participation in crimes which didn't result in death may have lulled him into a belief that death was not a serious threat. Finally, he claims the evidence is unclear whether either of the prior two incidents involved Walz—only one victim identified Walz in connection with the first incident and nobody identified Walz in connection with the second. Therefore, Perez argues, he was not sufficiently aware of the particular danger Walz posed.

But this misses the forest for the trees. As *Banks* itself acknowledges, not every factor needs to be present. The overriding question, which the *Banks* factors help answer, is whether "a defendant's personal involvement" was "substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder," with the actions of the Tisons and Enmund as points on a spectrum. (*Banks*, *supra*, 61 Cal.4th at p. 802.) Perez's actions undoubtedly fall closer to those of the Tisons than Enmund. Perez's active, willing, intentional participation in an armed residential burglary, knowing at least two people were in the home, and his actual use of the threat of death against at least one of the residents, makes him much more culpable than a simple getaway driver.

Moreover, his claims regarding his insufficient awareness of Walz's previous violence are unsupported by the evidence. While it's true only one victim identified Walz in connection with the first burglary, that is sufficient for the trial judge to have concluded Walz was involved. During this incident, either Walz or Perez hit one of their victims hard enough that Perez thought they'd killed him. Walz also became increasingly violent throughout the burglary, openly welcomed the arrival of more victims, and both

14

he and Perez lay in wait for those victims' arrival. The evidence was thus sufficient for the trial court to conclude Perez was apprised "of particular dangers posed by. . . past experience or conduct of the other participants." (*Banks*, *supra*, 61 Cal.4th at p. 803.)

C.     *Reckless Indifference to Human Life*

Turning to the second portion of the *Tison-Enmund* standard—that a felony murderer must have acted "with reckless indifference to human life"—our Supreme Court clarified the level of mental culpability required in *Clark*. In that case our Supreme Court summarized the United States Supreme Court's standard as "encompass[ing] a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) The court cited the Model Penal Code's definition of recklessness approvingly, which requires a person " 'consciously disregard[] a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Ibid.*) "This definition encompasses both subjective and objective elements. The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is

also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' " (*Ibid.*)

In order to aid courts and juries considering whether a defendant acted with reckless indifference to human life, the court offered another list of nonexclusive factors, much like it did in *Banks*. These factors are (1) the defendant's "[k]nowledge of [w]eapons, and [u]se and [n]umber of [w]eapons;" (2) their physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of the likelihood his cohorts will kill; and (5) their efforts to minimize the risks of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618-621.) The court made clear that as with the *Banks* factors that " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Id.* at p. 618.) Our colleagues in the First District have also recently held that "a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life. Indeed, the 'hallmark features' of youth—'among them, immaturity, impetuosity, and failure to appreciate risks and consequences'—are arguably more germane to a juvenile's mental state than to his or her conduct." (*In re Moore* (2021) 68 Cal.App.5th 434, 454 (*Moore*).)

Given these factors, we conclude substantial evidence exists to support the trial judge's conclusion that Perez acted with reckless indifference to human life. Perez knew that both he and his accomplice were armed with guns, saw Walz use his gun to threaten Michael, and used his own gun to threaten Georgia. Though Perez wasn't physically

16

present when Walz shot Michael, Perez saw Walz fighting with Michael and didn't try to help the victim or restrain his partner. Indeed, Perez made no effort whatsoever to minimize the risks of violence—in fact, the entire plan seems to have hinged on maximizing violence in order to overwhelm the already surprised victims and compel compliance. Walz intentionally picked a home invasion target where he knew people were home, and Perez willingly went along with this plan. The evidence is not only sufficient to conclude Perez made no effort to restrain the violence of the crime—it is sufficient to conclude that violence *was the point*.

Perez argues that certain of the factors suggest finding he didn't act with reckless indifference. He argues he didn't have knowledge of Walz's violent tendencies. He points out that he wasn't present when Walz shot Michael the first time—which would have been a fatal shot on its own—and may have implored Walz not to fire a second time. Finally, he argues his age must be taken into account in weighing each of these factors.

We have already addressed many of Perez's arguments regarding his knowledge of Walz's violent tendencies above. Suffice it to say, the evidence was sufficient for the court to conclude Walz and Perez worked together during the April 22, 1983 incident to terrorize a family and their friends, and that Perez had more than enough advance notice that Walz was willing, even eager, to use violence—whether necessary or not.

As for Perez not being physically able to stop the killing, we agree that Perez's absence during the actual killing, and his apparent objection to the killing, are minimally mitigating factors. While Perez is culpable for failing to intervene and stop the fight

17

between Michael and Walz which ultimately led to Michael's death, the evidence is otherwise clear that he was inside the house when Walz first fatally shot Michael.

However, we disagree that this sole mitigating factor means there was insufficient evidence to conclude Perez acted with reckless indifference. As we've described above, even assuming Perez didn't intend the killing and either attempted to stop Walz or chastised Walz after the fact, this doesn't change the fact there is ample evidence Perez otherwise consciously disregarded a substantial and unjustifiable risk of death, and that his conduct involved "a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." (*Clark*, *supra*, 63 Cal.4th at p. 617.)

We also disagree that Perez's age sufficiently reduces his culpability. Perez was 20 years old at the time of the crimes. This is young enough that the law recognizes this may reduce culpability in some circumstances. (See, e.g. § 3051, subds. (a)(1), (b) [allowing youth offender parole hearings for those under 25 "at the time of the controlling offense"].) We also agree with our colleagues in the First District that a judge should take young age into account when determining a defendant's mental culpability. (See *Moore*, *supra*, 68 Cal.App.5th at p. 454.)

However, this case is distinguishable from cases finding age was an important factor because though Perez was young, he was still an adult. For instance, *Moore* concerned a defendant who was only 16 when he and his accomplice spontaneously decided to rob three people in a parking lot, and his accomplice shot one of the victims unprovoked. (*Moore*, *supra*, 68 Cal.App.5th at p. 453.) In *People v. Harris* (2021) 60

18

Cal.App.5th 939, 944, the defendant was 17 when he participated in a firebombing that killed two children. Both of these cases involved minors who were at least three years younger than Perez at the time of their crimes.

Moreover, the evidence is sufficient to conclude Perez had enough mental culpability even taking into account his young age. Perez acted independently of Walz to threaten one of the victims; there is no evidence he was under duress or was otherwise being manipulated by Walz due to his age. The violence was not wholly unexpected, nor entirely spontaneous, and the evidence is sufficient to show that Perez participated with an understanding that violence and the threat of serious harm was an integral part of the criminal enterprise. This was not a spur of the moment robbery that ended in an impetuous, unprovoked, apparently thoughtless killing as in *Moore*. This was an armed home invasion which Perez and Walz embarked on with full knowledge that the residents were home and with every intention of violently subduing them. Perez didn't need " ' "experience, perspective, and judgment" ' to adequately appreciate the risk of death posed by his criminal activities." (*Moore*, *supra*, 68 Cal.App.5th at p. 454.)

Accordingly, we conclude there was sufficient evidence to support the trial judge's finding that Perez was a major participant in the underlying crime who acted with reckless indifference to human life, and that he was therefore not entitled to resentencing under section 1170.95.

## III.  DISPOSITION

We affirm.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:


McKINSTER
Acting P. J.


MENETREZ
J.